FILED

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

99 JAN 14  PM 12: 30

U.S. DISTRICT COURT
N.D. OF ALABAMA

THEDFORD L. HUDSON,       )
                          )
        Plaintiff,        )
                          )
v.                        )   CIVIL ACTION NO. 97-JEO-2423-S
                          )
JIM WALTER RESOURCES, INC.,  )
                          )
        Defendant.        )

ENTERED

JAN 14 1999

## MEMORANDUM OPINION

In this action, plaintiff Thedford L. Hudson ("Hudson"), asserts that defendant

Jim Walter Resources, Inc. ("JWR") illegally discriminated against him because of his

race when it failed to hire him for a position in 1996, while it hired white applicants, in

violation of Title VII of the Civil Rights Act of 1964 as amended, 42 U.S.C. § 2000e,

*et seq.*, and 42 U.S.C. § 1981.  Presently before the court is the defendant's motion for

summary judgment as to all the claims and the plaintiff's motion to have the court

reconsider its ruling on the defendant's motion to supplement its evidentiary submission.

Upon consideration, the court finds that the defendant's motion for summary judgment

is due to be granted and the plaintiff's motion for reconsideration is due to be denied.

## I. BACKGROUND

### A. The Application Process

The plaintiff submitted an application for employment with JWR at the Alabama

State Employment Office in Tuscaloosa, Alabama, on July 28, 1995. (Doct. 20, Hudson

Depo., Ex. 1). According to the application, he was seeking a position as a laborer. He is a 43-year old black male with some previous employment in underground mining. At the time of his application, his mining experience included jobs with Cowin & Company, Inc. ("Cowin"), from February 1995, until he was laid-off in April 1995; Triangular Construction ("Triangular") from November 1993 until he was laid-off in April 1994; and Alabama Byproducts Company, Inc.,("ABC") at the Maxine Mine for approximately twenty-three (23) months from August 1975 to July 1977. (Doct. 20, Hudson Depo., Ex. 1).

Approximately two months after the plaintiff submitted his application, he began inquiring about its status. He called once a month during September, October, and November 1995. (Doct. 20, Hudson Depo., pp. 206, 209). Each time, he talked with an unidentified female in the personnel department, who informed him that JWR was not hiring. (Doct. 20, Hudson Depo., pp. 196-209).

Around February 1996, Chris Wilson, a friend of the plaintiff who worked with him at Cowin, called the plaintiff two or three times and told him that JWR was hiring and that he should check on his application. (Doct. 20, Hudson Depo., pp. 197-98). Wilson was hired by JWR and called the plaintiff to inform him in March or April 1996. (Doct. 20, Hudson Depo., pp. 204-05, 216).

The plaintiff went to JWR's central mining office in Brookwood, Alabama, in or about March 1996 and talked with Rodger Armbrester ("Armbrester"), JWR's personnel

2

and benefits manager. (Doct. 20, Hudson Depo., p. 218). They talked for about ten minutes. The plaintiff conveyed his interest in working for JWR and Armbrester stated that he hoped the plaintiff would get the job, "if things work[ed] out." (Doct. 20, Hudson Depo., p. 219). Armbrester said that he would be in contact with the plaintiff. (*Id.*, pp. 216-20).

When Armbrester did not call the plaintiff within two or three days, the plaintiff went back to the JWR office and spoke to him. Although the plaintiff did not have an appointment, Armbrester met with him. Armbrester told the plaintiff that JWR was hiring at its Number Four Mine and he would arrange an interview for the plaintiff. (*Id.*, pp. 223-24). The plaintiff called Armbrester back about the interview. Armbrester told him to meet the Number Four Mine foreman for an interview. (*Id.*, p. 225).

The plaintiff was interviewed by Mr. Cooley ("Cooley"), the mine foreman. The interview lasted twenty to thirty minutes. They discussed the plaintiff's mining experience, availability, and possible wages. (*Id.*, pp. 266-67). Cooley told the plaintiff, "If everything go[es] all right . . . you will be coming to work." (*Id.*, p. 231). According to the plaintiff, he left the interview with a good feeling because he liked Cooley and he thought that Cooley liked him as well. (*Id.*).

After the interview, the plaintiff immediately went to the central office and met with Armbrester. He told the plaintiff that he was "checking around," that he would talk to the people at the mine, and, "If everything checks out, then [he would] be ready

3

to come and get [his] physical." (*Id.,* pp. 233-34, 274-75).

When the plaintiff did not hear from Armbrester after a day or two, he went back to the mining office. Armbrester met with him and told him that he had "some bad news" as they were not "going to be able to hire" him. (*Id.,* pp. 234-35). Armbrester said that things did not work out. (*Id.,* p. 235). He would not tell the plaintiff why he could not hire him. (*Id.*).

Two to three weeks later, the plaintiff went back to the Number Four Mine to talk with Cooley about his interview. (*Id.,* pp. 279-81). Cooley met with the plaintiff and told him the interview "was all right; my interview was fine." (*Id.,* pp. 237, 281). He told the plaintiff that he could not hire him. (*Id.,* p. 236). The plaintiff then went to see Armbrester. (*Id.,* p. 237). He again told Armbrester he wanted the job. Armbrester told him that he could not hire him and that he could not tell him why. (*Id.,* p. 239).

### B. JWR's Use of References

Armbrester regularly checked prior job references as part of the hiring process. (Doct. 20., Armbrester Depo., pp. 10-11). He would contact prior employers after the applicant had been pre-screened and deemed to have sufficient underground mining experience for the particular position for which he or she was applying. (*Id.,* p. 11). For instance, in this matter, the mine manager wanted people with at least three years of underground mining experience. (*Id.,* p. 12). References were identified by speaking

4

with an individual at a previous employer who had some knowledge of the applicant's work history. (*Id.*, pp. 15-19). Armbrester stated that he made sure that the individual rendering a reference had knowledge of the applicant's work history. (*Id.*, p. 19).

The plaintiff was considered qualified for a position at the Number Four Mine until Armbrester contacted the plaintiff's prior employers in the mining field. (*Id.*, pp. 32-33). Armbrester stated that if he had gotten a good reference on the plaintiff on the first call, he would have been hired. (*Id.*, pp. 79-80). He selected the three prior employers, Cowin, Triangular, and ABC, because they did underground mining. (*Id.*, pp. 32-33). They were contacted between the plaintiff's application and his rejection. (*Id.*, pp. 11, 14, 50). Premised on the negative references he received from each contact, Armbrester decided not to hire the plaintiff. (*Id.*, p. 81).

### 1. The negative reference from Cowin

Armbrester contacted John D. Moore ("Moore"), the Director of Safety and Human Resources at Cowin. (Moore Depo., pp. 5-6). Although Cowin generally limits reference information to dates of employment, Moore provided Armbrester with additional information on the plaintiff as a courtesy because JWR was a customer. (*Id.*, pp. 13, 33). He noted that when he did provide information, he wanted to be accurate. (*Id.*, p. 32). He had observed the plaintiff during the six to seven weeks that he worked at Cowin.  (*Id.*, pp. 9, 34-35).

According to Armbrester, Moore gave the plaintiff a negative reference, describing

5

him as not being "a real hard worker" and a person who "did his job but not with a lot of energy or enthusiasm." (Doct. 20, Armbrester Depo., Ex. 4). He further rated the plaintiff as fair in the areas of attendance, performance, and attitude. (*Id*.). At his deposition, Moore did not recall the specific comments concerning the plaintiff's work ethics attributed to him by Armbrester, but he stated that he "could have made the statement[s]" as noted by Armbrester because they were "essentially accurate." (Doct. 20, Moore Depo., pp. 45, 47, 54). He also stated that it is accurate to describe the plaintiff's attitude and job performance while at Cowin as fair. (*Id.*, p. 54).

### 2. Negative reference from Triangular

When Armbrester tried to contact Triangular for a reference on the plaintiff, it was no longer in business. He called Gene Gentry ("Gentry"), the former owner and operator of Triangular, for a reference. (Doct. 20, Armbrester Depo., p. 34 and Ex. 3). Armbrester's best recollection was that he was able to get in touch with Gentry, who was then in Louisiana, by contacting his wife at home. (Doct. 20, Armbrester Depo., pp. 35-36). Gentry personally observed the plaintiff when he worked at Triangular from November 1993 until April 1994. (Doct. 20, Armbrester Depo., pp. 36-37; Gentry Declaration, ¶ 3). Gentry gave the plaintiff a poor rating on attendance, performance, and attitude. (Doct. 20, Armbrester Depo., Ex. 3; Gentry Declaration, ¶ 5).

### 3. Negative reference from ABC - Maxine Mine

Armbrester also contacted Jerry Millwood ("Millwood") for a reference on the

plaintiff from his days with ABC in the mid to late 1970s. Millwood was previously a foreman at the ABC - Maxine Mine and worked there during the time that the plaintiff was employed by ABC. Millwood had the opportunity to observe the plaintiff and described him as being a poor worker with a poor attitude and attendance record. (Doct. 20, Armbrester Depo., p. 41 and Millwood Declaration, ¶¶ 3-6). According to Armbrester's record of the contact, Millwood stated that the plaintiff "was not a good worker. [His] job performance was below average. He took a long time to do his work and had to be supervised pretty close." (*Id.*). Millwood confirmed his prior assessment of the plaintiff in his declaration and stated that he would not rehire the plaintiff. (Doct. 20, Millwood Declaration, ¶ 6).

Armbrester could not remember how he contacted Millwood. (Doct. 20, Armbrester Depo., pp. 41, 43, 48-49). He did describe the usual procedures that he used to locate references, including the application, personal contacts, calling former employers, or directory information. (Doct. 20, Armbrester Depo., pp. 15-22, 44-46).

## C. White Applicants That Were Hired About the Time of the Plaintiff's Application

The plaintiff asserts that several white applicants who lacked underground mine experience were hired by JWR around the time that his application was rejected. He names Chris Wilson, Kirk Wilson, Mike Boyd, Milford Bailey, and Joe Riggs. The plaintiff acknowledges that he lacks any personal knowledge about the work history or the references contacted by Armbrester concerning these individuals. (Doct. 20, Hudson

7

Depo., pp. 215, 290-93).

According to Armbrester, he checked at least one reference on each of the white applicants.  Because they all were formerly with Cowin, he contacted Richard Cates ("Cates").  He previously worked in the personnel department at Cowin and was then a JWR employee. (Doct. 20, Armbrester Depo., p. 57).  Again, according to Armbrester, Cates hired most of the individuals and was familiar with their work habits.  (*Id.*, pp. 57, 72-73, 76).

### 1. Floyd Chris Wilson

Floyd Chris Wilson's application shows that he worked for Cowin as a "miner driller" from February 25, 1995, until he was laid-off on April 12, 1995.  He worked as a general inside laborer at a mine with Nabala Coal Company from August 17, 1991, to July 7, 1994. (Doct. 36, C. Wilson App., p. 2).  The application also states that he had "inside" mining experience as an air drill operator, a "bratticeman (Blocks)," a coal power drill operator, a laborer, a trackman, and that he had "construction" experience as a shaft driller .  (*Id.*, p. 3).  Cates' reference described him as a "good hard worker," who "did not lay off," and "would do what you asked him to do." (Doct. 20, Cowley Declaration, Ex. 2).

### 2. James Kirk Wilson

James Kirk Wilson's application shows that he had been working with Cowin since June 30, 1992, as a "miner driller." (Doct. 36, J. Wilson App., p. 2).  The

8

application also states that he had "inside" mining experience as a "bratticeman," a laborer, and a rock duster, and that he had construction experience as a driller and a mucking machine operator. (*Id.,* p. 3). Cates' reference stated that James Wilson "worked regular and was a good man. [He] worked hard and did what he was assigned to do." (Doct. 20, Cowley Declaration, Ex. 3). A second reference on Wilson, Bruce Mabe, a Cowin foreman, also stated that Wilson was a "good man" with a "good work attitude" who would "make a good employee." (Doct. 20, Cowley Declaration, Ex. 3). A third reference, Mike Thivodeaux, a supervisor with Black Warrior Contracting, described Wilson as a hard worker and a good man who did what he was assigned. (*Id.*).

### 3. Michael Dennis Boyd

Michael Dennis Boyd's application shows that he worked for Cowin as a miner and equipment operator from 1992 to 1995. Before that, from 1990 to 1992, he was a miner in Utah. (Doct. 36, Boyd App., p. 2). The application also shows that he had multi-faceted "inside" mining experience. (*Id.*, p. 3). Cates' reference on Boyd provided that he was a "good regular employee," who had no attendance problems, and was a hard worker with a "good grasp of coal mining." (Doct. 20, Cowley Declaration, Ex.1).

### 4. Oliver Milford Bailey

Oliver Milford Bailey's application shows that he had been working with Cowin since October 1991 as a mechanic. (Doct. 36, Bailey App., p. 2). His mining experience included various positions inside and outside mines, and with construction. (*Id.,* p. 3).

9

Separate sheets to his application detailed his extensive experience in the coal industry, equipment repair, and underground mining. (Doct. 20, Cowley Declaration, Ex. 4). Cates stated that Bailey was a "very good employee, [who] knows his business and can get the work completed in an efficient manner," that he "works every day and gets along well with his co-workers," and that the company "would not go wrong in hiring him." (Doct. 20, Cowley Declaration, Ex. 4).

Cates rated Bailey, as well as the other applicants, excellent in the areas of attendance, job performance, and attitude. (Doct. 20, Cowley Declaration, Ex. 1-4).

### 5. Joe Riggs

When Joe Riggs was rehired by JWR in 1996, he had mining experience, including nineteen months at JWR's Number Seven Blue Creek Mine, and about five years with Cowin. (Doct. 20, Cowley Declaration, Ex. 5). The plaintiff acknowledged Riggs' experience at the deposition when he stated that Riggs was his direct supervisor at Cowin and that he "might have more" underground mining experience than the plaintiff. (Doct. 20, Hudson Depo., pp. 89-90, 212).

### II. PLAINTIFF'S MOTION TO RECONSIDER

JWR filed its motion for summary judgment on July 7, 1998. Included in its submission was the declaration of Shelby Cowley.[1] The declaration included the JWR employment applications of Floyd Chris Wilson, James Kirk Wilson, Michael Dennis

---

[1] The Cowley declaration that was submitted was a "faxed" copy. On July 20, 1998, JWR's counsel filed the original, signed Cowley declaration. (Doct. 22). There were no exhibits attached.

Boyd, and Oliver Milford Bailey. The applications are double-sided documents. When the Cowley declaration and attachments were submitted to the court, the back side of the original applications for the Wilsons and Boyd were not included. (Doct. 20, Cowley Declaration, Ex. 1-3).

On September 3, 1998, after counsel for the plaintiff filed her brief and substitute brief, noting the missing pages, counsel for JWR filed a motion to supplement its evidentiary submission. JWR's counsel stated that they became aware of the deficiency when they read the plaintiff's brief in the process of preparing their reply brief in support of the motion for summary judgment. Counsel immediately submitted the complete applications and requested that the record be supplemented. (Doct. 36). The court granted the motion. (Doct. 37).

The plaintiff now asks this court to reconsider its decision allowing the defendant to supplement its evidentiary submission. In support of the motion, the plaintiff's counsel asserts that the defendant should not be allowed to supplement the record with the additional pages as they were "obviously willfully omitted" and it constitutes evidence of "pretext" and JWR's "invidious motives. . . to cover up discrimination." (Doct. 39, p. 1).

JWR has filed a response to the plaintiff's motion to reconsider, again asserting that the omission was inadvertent and unintentional on the part of its counsel. (Doct. 40, p. 2). It also notes that this court has afforded the plaintiff latitude in filing his

second responsive brief.[2]  Finally, JWR states that the plaintiff has not been prejudiced by the oversight of its counsel.  (*Id.*, pp. 2-3).

Upon further review and consideration, the court finds that the decision to allow the record to be supplemented is due to stand.  Plaintiff has suffered no prejudice as a result of the supplementation by JWR.  Counsel had the opportunity to address the supplemental material in the brief submitted on September 15, 1998.  Additionally, there is no evidence whatsoever warranting a conclusion by this court that counsel for JWR willfully omitted the pages.  Accordingly, the plaintiff's motion to reconsider the prior determination and exclude the additional pages is denied.

## III.  SUMMARY JUDGMENT STANDARD

Summary judgment is to be granted only if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the declarations, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  *Fed. R. Civ. P.* 56(c); *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986).  The party asking for summary judgment "bears the initial burden to show the district court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial.  Only when that burden has been met does the burden shift to the

---

[2] Counsel for the plaintiff has been permitted to submit a brief in opposition to the defendant's motion for summary judgment, which was received August 6, 1998, a substitute brief that was received on August 10, 1998, and a third response brief that was submitted September 15, 1998.  Further, the court granted the plaintiff's counsel additional time to conduct discovery after the plaintiff's original counsel withdrew.  (Doct. 13).

nonmoving party to demonstrate that there is indeed a material issue of fact that precludes summary judgment." *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991); *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S. Ct. 1598, 1608, 26 L. Ed. 2d 142 (1970).

The movant can meet this burden by presenting evidence showing there is no dispute of material fact, or by showing that the nonmoving party has failed to present evidence in support of some element of his case on which he bears the ultimate burden of proof. *Celotex,* 477 U.S. at 322-23; *see Fed. R. Civ. P.* 56(a) and (b). Once the moving party has met his burden, Rule 56(e) "requires the nonmoving party to go beyond the pleadings and by . . . affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial,'" *Celotex,* 477 U.S. at 324. The nonmoving party need not present evidence in a form necessary for admission at trial; however, the movant may not merely rest on the pleadings. *Id.*

After a motion has been responded to, the court must grant summary judgment if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *Fed. R. Civ. P.* 56(c). Rule 56(c) mandates the entry of summary judgment against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. *Celotex,* 477 U.S. at 322.

The substantive law will identify which facts are material and which are irrelevant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. "[T]he judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249. A judge's guide is the same standard necessary to direct a verdict: "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 259; *see Bill Johnson's Restaurants, Inc. v. NLRB*, 461 U.S. 731, 745 n.11, 103 S. Ct. 2161, 76 L. Ed. 2d 277 (1983); *Allen v. Tyson Foods, Inc.*, 121 F.3d 642, 643 (11th Cir. 1997). However, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986).

If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted. *Anderson*, 477 U.S. at 249 (citations omitted); *accord Spence v. Zimmerman*, 873 F.2d 256 (11th Cir. 1989). Furthermore, the court must "view the evidence presented through the prism of the substantive evidentiary burden," so there must be sufficient evidence on which the jury could reasonably find for the plaintiff. *Anderson*, 477 U.S. at 254; *Cottle v. Storer Communication, Inc.*, 849 F.2d 570, 575 (11th

Cir. 1988). Nevertheless, credibility determinations, the weighing of evidence, and the drawing of inferences from the facts are the function of the jury, and therefore the evidence of the nonmovant is to believed and all justifiable inferences are to be drawn in his favor. *Anderson*, 477 U.S. at 255. The nonmovant need not be given the benefit of every inference but only of every reasonable inference. *Brown v. City of Clewiston*, 848 F.2d 1534, 1540 n.12 (11th Cir. 1988). "If reasonable minds could differ on the inferences arising from undisputed facts, then a court should deny summary judgment." *Allen*, 121 F.3d at 643.

## IV. *McDonnell Douglas* Analysis

### A. Generally

The Supreme Court's disparate treatment cases, such as *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S. Ct. 1817, 1824, 36 L. Ed. 2d 668 (1973) and *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 101 S. Ct. 1089, 67 L. Ed. 2d 207 (1981), provide the appropriate starting point for evaluating the plaintiff's Title VII claim for discriminatory non-hiring. *Turnes v. AmSouth Bank, N.A.*, 36 F.3d 1057, 1060 (11th Cir. 1994). The *McDonnell Douglas* scheme for the allocation of burdens and the order of presentation of proof also applies in employment cases under 42 U.S.C. § 1981. *Turnes*, 36 F.3d at 1060.

Under the applicable standard in a case like this, where the claims are premised upon circumstantial evidence of discrimination, the plaintiff has the initial burden of

establishing a prima facie case of discrimination.  *McDonnell Douglas*, 411 U.S. at 802;

*Burdine,* 450 U.S. at 253-54 & n.6; *Combs v. Plantation Patterns*, 106 F.3d 1519, 1527-28

(11th Cir. 1997), *cert. denied,* ___ U.S. ___, 118 S. Ct. 685, 139 L. Ed. 2d 632 (1997).

Once the plaintiff establishes a prima facie case, a legal presumption of unlawful

discrimination arises and the burden shifts to the defendant employer to articulate a

legitimate, nondiscriminatory reason for the challenged employment action.  *McDonnell*

*Douglas*, 411 U.S. at 802; *Burdine*, 450 U.S. at 254; *Combs*, 106 F.3d at 1528.  "To satisfy

that burden of production, '[t]he defendant need not persuade the court that it was

actually motivated by the proffered reasons.  It is sufficient if the defendant's evidence

raises a genuine issue of fact as to whether it discriminated against the plaintiff.'"  *Combs,*

106 F.3d at 1528 (quoting *Burdine*, 450 U.S. at 254-55).

Once the employer meets its burden of production, "[t]he presumption, having

fulfilled its role of forcing the defendant to come forward with some response, simply

drops out of the picture,"  *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 510-11, 113

S. Ct. 2742, 2749, 125 L. Ed. 2d 407 (1993); *see also Burdine*, 450 U.S. at 255 & n.10,

leaving the elements of the prima facie case.  *Combs*, 106 F.3d at 1528.  When those

elements are accompanied by evidence of pretext or disbelief of the defendant's proffered

explanation, they may permit, in some instances, a finding for the plaintiff.  *Id*. at 1529;

*see also Hicks*, 509 U.S. at 511;  *Evans v. McClain of Georgia, Inc.*, 131 F.3d 957, 963 (11th

Cir. 1997).  The plaintiff, however, always retains the ultimate burden of proving that

he was the victim of intentional discrimination. *Hicks*, 509 U.S. at 508; *Burdine*, 450 U.S. at 253.

The court's task in deciding the defendant's motion for summary judgment is limited. The court "must, in view of all the evidence, determine whether the plaintiff has cast sufficient doubt on the defendant's proffered nondiscriminatory reasons to permit a reasonable factfinder to conclude that the employer's proffered 'legitimate reasons were not what actually motivated its conduct'....The district court must evaluate whether the plaintiff has demonstrated 'such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could find them unworthy of credence.'" *Combs*, 106 F.3d at 1538 (citations omitted).

### B. Application of *McDonnell Douglas*

#### 1. The legitimate, nondiscriminatory reason for the action

For consideration of the motion for summary judgment, the defendant concedes, and the court assumes, that the plaintiff has made a prima facie case. The defendant has met its burden to articulate a legitimate, nondiscriminatory reason for its action, since it has presented admissible evidence that it rejected the plaintiff due to the negative evaluations Armbrester received concerning him. That evidence consists of the testimony of Armbrester that he received three negative references on the plaintiff and the testimony of Moore and the declarations of Millwood and Gentry confirming that

they discussed the plaintiff's work performance with Armbrester and it was not favorable.

### 2. The plaintiff's showing of pretext

As the defendant has met its burden, the plaintiff must produce "evidence sufficient to discredit in the mind of a reasonable juror all of the defendant's proffered nondiscriminatory reasons for its actions." *Combs*, 106 F.3d at 1543. The plaintiff asserts several arguments that defendant's asserted legitimate, nondiscriminatory reason is pretextual.

### a. The references did not exist or were created after the decision not to hire the plaintiff

The plaintiff first challenges the defendant's assertion that the negative references were the basis of its decision by claiming that Armbrester never contacted the references. The plaintiff asserts that the references are merely "an invidious attempt to cover up a racially discriminatory act." ("Plaintiff's Brief In Response of Defendant's Motion For Summary Judgment" ("Plaintiff's First Brief"), p. 12, 14, 17; "Plaintiff's Substituted Brief 56(f) Motion And Affidavit In Response Of (sic) Defendant's Motion for Summary Judgment" ("Plaintiff's Second Brief"), p. 12; "Plaintiff's Response Brief In Opposition To Defendant's Motion For Summary Judgment" ("Plaintiff's Third Brief"), p. 1). He also states that the defendant "constructed the references with individuals they knew would support the fabrication." (Plaintiff's First Brief, p. 12). In the plaintiff's third brief, he makes it clear that he "challenges the existence of the references at the time

JWR rejected the Plaintiff." (Plaintiff's Third Brief, p. 1).[3] The plaintiff claims that JWR can not establish at what point the plaintiff's references were checked.

The Eleventh Circuit Court of Appeals has made it clear that "[c]onclusory allegations of discrimination, without more, are not sufficient to raise an inference of pretext or intentional discrimination where [a defendant] has offered extensive evidence of legitimate, non-discriminatory reasons for its actions." *Isenbergh v. Knight-Ridder Newspaper Sales, Inc.*, 97 F.3d 436, 444 (11th Cir. 1996), *cert. denied*, ___ U.S. ___, 117 S. Ct. 2511, 138 L. Ed. 2d 1014 (1997), *citing Young v. General Foods Corp.*, 840 F.2d 825, 830 (11th Cir. 1988), *cert. denied*, 488 U.S. 1004, 109 S. Ct. 782, 102 L. Ed. 2d 774 (1989). Other than mere conjecture, there is no evidence to support the plaintiff's assertion that Armbrester never contacted the enumerated references or that he deliberately contacted individuals who would be inclined to give references supporting an existing decision not to hire the plaintiff. As will be further discussed, the record affirmatively demonstrates that the references were contacted and that Armbrester relied on them to formulate the challenged employment decision, rather than to support a decision he had already made.

Regarding the claim that JWR can not show when the references were contacted,

---

[3] The plaintiff states that he is not challenging the substance of the references, only their existence at the time of his application. The court finds that Armbrester did in fact rely on the references. The plaintiff can not show pretext by challenging Armbrester's judgment in relying on these references but only by showing he did not honestly use them for reaching his decision. *Elrod v. Sears Roebuck and Co.*, 939 F.2d 1466, 1470 (11th Cir. 1991); *Lewis Calhoun v. City of Jackson*, 977 F. Supp. 1148, 1154 (S.D. Ala. 1997), *aff'd.*, 152 F.3d 935 (11th Cir. 1998)(Table), *citing Combs*, 106 F.3d at 1543. As is set forth below, however, the evidence indicates that Armbrester did rely on the references in making the challenged decision.

the plaintiff states that the telephone contact records at JWR do not include a date. The plaintiff is correct that the documents are not dated. The evidence does show, however, when the calls were made. Armbrester testified at his deposition that the references were contacted between the date of the plaintiff's application and the date he was told that he was rejected. (Doct. 20, Armbrester Depo., pp. 11, 14, 49-50). The plaintiff has not sufficiently challenged this evidence to allow a reasonable factfinder to "find them unworthy of credence." *Combs*, 106 F.3d at 1538.

Alternatively, the plaintiff challenges the individual references on numerous grounds. Each reference will be addressed separately.

### i. The Moore (Cowin) reference

The plaintiff asserts that the Moore reference is pretextual because Moore was not his supervisor at Cowin, was not listed on his JWR application, and Moore was employed by a vendor of JWR. He states that Moore was biased because of the fear that losing JWR's business could result in "great financial loss" to Cowin. (Plaintiff's First Brief, p. 17; Plaintiff's Second Brief, p. 17). Additionally, he states that Moore's reference is not credible because Moore refused to swear at his deposition that the statements were made by him at the time JWR rejected the plaintiff. (Plaintiff's Third Brief, p. 5). The evidence does not support these arguments, however.

Armbrester explained that in calling the references he chose them based on the fact that the companies had underground mining experience. (Doct. 20, Armbrester

20

Depo., pp. 32-33). His call to Moore, the Director of Safety and Human Resources at Cowin, makes sense under the circumstances. Nothing in the record demonstrates that this contact was a pretext for illegal discrimination. There is no requirement that the employer contact the particular references or individuals listed on an individual's application. To the contrary, contacting another reference, such as a human resources director, is prudent. There further is no requirement that the employer contact the applicant's direct supervisor.

The plaintiff's claim that Moore was biased because "[l]osing JWR business could result in great financial loss for Cowin" is conjecture and unsupported by the record. (Plaintiff's Second Brief, p. 17). It is not even clear how such a bias on Moore's part would support the plaintiff's claims in this case.

Regarding the assertion that Moore refuses to swear that he made the statements at the time of the decision to reject the plaintiff, Armbrester testified that he talked with Moore before making his final decision and that Moore told him that he had observed the plaintiff at work, that he was not "a real hard worker," and that he was a person who "did his job without a lot of energy or enthusiasm." (Doct. 20, Armbrester Depo., pp. 11, 14, 39-40, 50, Ex. 4; Moore Depo., pp. 9, 34-35). At the deposition, Moore recalled talking with Armbrester. He did not deny making the statements, but stated that the information was "essentially accurate." (Doct. 20, Moore Depo., pp. 45, 54). The plaintiff's assertions do not sufficiently challenge Armbrester's testimony as to when he

made the contacts.

### ii. The Millwood (ABC) reference

The plaintiff asserts that the Millwood reference is pretextual because Millwood was not his supervisor at ABC and was not listed on the JWR application.  As is explained above, these facts are insufficient to support a finding of pretext.  In addition, Millwood's affidavit reflects that his reference was not pretextual.  In his affidavit, Millwood states that he was "a foreman at the ABC - Maxine Mine" when Hudson was there.  He does not state that he supervised Hudson, but states that he observed him perform his job.  (Doct. 20, Millwood Declaration).  In contravention of Millwood's evaluation, the plaintiff submits the affidavit of Melvin Harris ("Harris").  He was the plaintiff's supervisor for at least a portion of the time he was at the ABC Maxine Mine.[4] He states that the plaintiff was an excellent worker with an excellent attitude.  He did not recall any attendance problem with the plaintiff.  Harris also states that, to his knowledge, Millwood did not supervise the plaintiff.  (Doct. 30, Harris Affidavit).[5] That Harris describes the plaintiff's work history favorably does not demonstrate that the Millwood reference is pretextual.

The plaintiff also questions Armbrester's explanation of how he obtained

---

[4] The affidavit does not state the dates Harris worked for ABC or the dates he supervised the plaintiff.

[5] The plaintiff points out that Millwood's employment records from ABC show he was promoted to a supervisor on September 1, 1997, one month after the plaintiff left ABC. (Doct. 30, Plaintiff's Ex. 1; See also Doct. 30, Harris' Affidavit).  He also notes that the same records show that Millwood worked at ABC from 1970 through 1977 and that he substituted as a foreman many times. (Doct. 30, Defendant's Ex. 1).

Millwood's telephone number. (Plaintiff's First Brief, pp. 21-22; Plaintiff's Second Brief, pp. 20-21). He states that "for this court to give Millwood's declaration the weight sufficient to support a Motion for Summary Judgment, JWR would need to explain how it came into contact with Millwood, as the evidence would establish that there was no connection." (Plaintiff's Third Brief, p. 3). According to the plaintiff, the Millwood reference is not worthy of belief because Armbrester could not have gotten Millwood's number from ABC - Maxine Mine (because it was closed) or from directory assistance (because the number was unlisted). Further, his telephone number on his 1970 application with ABC is different from the number on Armbrester's notes of the conversation. (Doct. 32, p. 2).

Armbrester testified that he did not recall where he got the number for Millwood. (Doct. 20, Moore Depo., p. 43). He described how he usually obtained phone numbers on references, but he clearly did not recall the specifics concerning Millwood. (*Id.*, pp. 43-47). What is clear is that Armbrester contacted Millwood and Millwood's reference on the plaintiff was negative. That he was unable to recall how he located Millwood's telephone number is not sufficient to show pretext.

### iii. The Gentry (Triangular) reference

The plaintiff asserts that the Triangular reference is pretextual because Gentry was not his supervisor and "Armbrester chose to chase down Gene Gentry in Louisiana" when he easily could have contacted Ray Lively, the former supervisor that the plaintiff

listed on his application.  (Plaintiff's First and Second Briefs, p. 22).  These assertions have been reviewed and rejected already regarding the other references.

The plaintiff also notes that Gentry is biased against him due to a grievance that the plaintiff filed against Gentry and the company while he worked for Triangular.[6] (Plaintiff's Third Brief, p. 4).  Because JWR relies on Gentry to support its position that three negative references were received prior to rejecting him and because the plaintiff filed and won a grievance against Gentry and Triangular, the plaintiff asserts that this bias raises a factual issue that must be submitted to a jury.  (*Id.*, p. 4).  The fact that the plaintiff filed a grievance against Gentry and won may reflect upon Gentry's intent, but it is Armbrester's intent that is at issue.  This evidence is therefore not sufficient to create a factual issue concerning JWR's intent warranting submission of this matter to a jury.

### b.  The defendant never intended to hire him

The plaintiff next argues that the defendant never intended to hire him.  (*Id.*). This claim is premised on the fact that an unidentified employee at JWR told him when he called that the company was not doing any hiring and yet other persons, specifically, white applicants were hired.  (*Id.*, pp. 12-13; Plaintiff's Second Brief, p. 13).  The

---

[6] Specifically, the plaintiff states that Gentry's objectivity is questionable premised on the fact that he and other workers at Triangular filed a union grievance against Gentry.  In that grievance, the plaintiff asserted that Gentry laid-off qualified, experienced workers while keeping less qualified workers.  According to the plaintiff, the union conducted an investigation and found for the workers.  He received back pay for the period he was laid off. (Doct. 30, Hudson Affidavit).

plaintiff also argues that this claim is supported by the fact that the white employees' applications were processed more quickly. (Plaintiff's First Brief, pp. 13-14; Plaintiff's Second Brief, p. 14). Further, he states that JWR's intent to never hire him is shown by JWR's failure to contact the plaintiff's references that were listed on the application. (Plaintiff's Third Brief, p. 3).

The record simply does not support the assertion that JWR never intended to hire the plaintiff. Armbrester talked with him numerous times, set up an interview for him at a mine where a position was available, contacted numerous previous employers for references and considered the plaintiff qualified until he received the negative references. This conclusion is not changed by the fact that an unidentified female employee at JWR informed the plaintiff over the phone that JWR was not hiring. Such evidence does not support a finding that JWR's legitimate, nondiscriminatory business reason for rejecting the plaintiff's application was merely a pretext for illegal discrimination.

Concerning the processing of the white applicants, the record shows the application dates for the Wilsons, Bailey, and Boyd. It does not show when their references were contacted or when they were hired. The record shows when Riggs was hired, but not when he submitted his application. However, despite these deficiencies, it is evident their circumstances are distinct from the plaintiff for reasons unrelated to race. First, Armbrester was able to more quickly conduct a reference check on them as Cates, a JWR employee who was familiar with their past employment at Cowin, was

readily available. Second, the references were all positive, including all three that were obtained on James Wilson.

### c. Less qualified white applicants were hired

The plaintiff next claims that pretext is shown because the white applicants that were hired were less qualified than was he.   He asserts that the white applicants communicated their lack of experience to him and that their applications confirm it. (Plaintiff's First and Second Briefs, pp. 15-16; Plaintiff's Third Brief, p. 3; Doct. 20, Hudson Depo., pp. 289-92).  Specifically, at his deposition, the plaintiff asserted that the white applicants lacked underground mining experience.  In the brief, he claims that Chris Wilson had only three months verifiable mining experience and that he (the plaintiff) was more qualified than two of the white applicants.  (Plaintiff's Third Brief, p. 3).  He further questions the veracity of Cates' recommendations on these individuals. (Plaintiff's First Brief, p. 24; Plaintiff's Second Brief, p. 23).  For instance, he notes that, in his JWR job application, Wilson lists Gregg Stepp, not Cates, as his immediate supervisor during the two months he was at Cowin.  (Plaintiff's First Brief, p. 24). The plaintiff notes that Cates' recommendations are also questionable because he is employed by JWR.

It must be remembered that federal courts "do not sit as a super-personnel department that reexamines an entity's business decisions. . . .[The] inquiry is limited to whether the employer gave an honest explanation of its behavior." *Elrod*, 939 F.2d

26

at 1470. It must also be remembered that the experience required for a particular JWR position varies depending on the mine manager involved. (Doct. 20, Armbrester Depo., p. 12). Here the jobs for which the plaintiff was considered required "three years of underground mining experience." (Id.).[7]

The court has examined the applications of the Wilsons, Bailey, and Boyd.[8] Each application shows that the respective applicant had sufficient mining experience to warrant contacting the references. According to his application, Floyd Chris Wilson did have three months mine drilling experience at Cowin, as noted by the plaintiff, but he also had an additional three years general inside labor experience with Nabala Coal Company. His application specifically lists six positions he held while working in the mines. (Doct. 36, Floyd Christopher Wilson App., p. 3). James Kirk Wilson's application shows that prior to coming to JWR he had been working at Cowin since June 1992 as a "miner driller." (Doct. 36, James Kirk Wilson App., p. 2). His mining experience was detailed in the application as well and shows that he had experience in at least four areas inside a mine. (Id.). Boyd's application shows that he worked with Cowin from 1992 to 1995. He also worked for a mining company in Utah from 1990

---

[7] At various places in the deposition, Armbrester states that the experience requirement was twelve months experience within the last three years. (Doct. 20, Armbrester Depo., pp. 13-14) However, if this were the case, the plaintiff would not be qualified as he had only a couple of months mining experience within the last three years of his application date. (Doct. 20, Hudson Depo., Ex. 1). Most of his experience during that period was with Wal-Mart. (Id.). The majority of the plaintiff's underground mining experience is from his employment with the ABC - Maxine Mine from 1975 to 1977. (Id.).

[8] The court was not provided the application of Riggs. However, his JWR employee profile shows that he had extensive mining experience when he was rehired in March 1996. (Doct. 20, Cowley Declaration, Attachment 5). His experience dated from 1976 to 1996. (Id.).

to 1992. (Doct. 36, Michael Dennis Boyd App., p. 2). Bailey's application shows that he worked for Cowin since 1991 as a mechanic. His application included extensive coal industry experience.[9] (Doct. 36, Oliver Milford Bailey App., p. 3). Under the facts presented, Armbrester's decision to contact Cates for references on these individuals is consistent with JWR's legitimate, nondiscriminatory practice. The plaintiff has not adequately challenged that practice.

The plaintiff's assertion that pretext is evident because Armbrester contacted Cates rather than Greg Stepp, who was listed on Chris Wilson's application, is also without merit. Using Cates, who was familiar with these applicants and was readily available because he now worked at JWR, to check on these individuals is logical and certainly does not demonstrate pretext. The fact that Cates worked for JWR at the time he made the recommendations does not sufficiently bring JWR's motives into question to warrant submission of this case to a jury. If Armbrester was considering these applicants for positions with JWR, it certainly would be in Cates' interest to be candid with Armbrester since his recommendation could result in the applicants being hired. If he made an inappropriate recommendation as to any of them, Cates' judgment would have been called into question by Armbrester and JWR. It was in his interest to be candid about each applicant's work ethics and abilities.

---

[9] The plaintiff notes in his deposition that Bailey was hired for outside work, not the position he applied for. (Doct. 20, Hudson Depo., p. 291).

### d. Purported attempts to obtain a good reference

The plaintiff next claims that pretext is evident from Armbrester's explanation of his efforts to obtain a good reference on the plaintiff. Specifically, the plaintiff states that Armbrester's explanation "stretches the bounds of logic" and his efforts to contact the references were "fantastic and unreasonable." (Plaintiff's First Brief, p. 19; Plaintiff's Second Brief, p. 20). According to the plaintiff, Armbrester's explanation is incredible because if he truly wanted to obtain a positive reference as he asserts, he could have used any of the individuals named on the application.

As already discussed, the court disagrees with the plaintiff's assessment that it was illogical for Armbrester to not use the references listed on the plaintiff's application. Armbrester's actions were not "fantastic" or "unreasonable" as asserted by the plaintiff. He followed his usual procedure by contacting mining companies where the plaintiff worked. He obtained references from individuals in management positions that were familiar with the plaintiff. That these individuals were not the ones listed on the plaintiff's application does demonstrate an improper motive on the part of Armbrester. Instead, it shows that Armbrester used a reasonable and appropriate business practice to obtain a candid assessment of the plaintiff. This court can not fault him for that practice under the present facts.

In sum, the plaintiff has failed to produce sufficient evidence to permit a reasonable juror to reject as spurious JWR's explanation for not hiring him. *Combs*, 106

F.3d at 1543.

## V.  CONCLUSION

Accordingly, for the reasons stated above, defendant JWR's motion for summary judgment (doct. 19) is due to be **GRANTED**.  Further, the plaintiff's motion to reconsider the court's order allowing the defendant to supplement its evidentiary submission (doct. 39) is **DENIED.**  An order consistent with this memorandum opinion will be entered contemporaneously herewith

DONE this the ____ day of January, 1999.

JOHN E. OTT
UNITED STATES MAGISTRATE JUDGE